IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Civil No. 1:20CV722 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| $41,538.00 in U.S. CURRENCY, | : | |
| Defendant. | : | |

## **VERIFIED COMPLAINT OF FORFEITURE**

NOW COMES the plaintiff, United States of America, by and through Matthew G.T. Martin, United States Attorney for the Middle District of North Carolina, and respectfully states as follows:

1.      This is a civil action *in rem* brought to enforce the provisions of 21 U.S.C. § 881(a)(6) for the forfeiture of the defendant property, which was furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, or represents proceeds traceable to such an exchange.

2.      This action is also brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of the aforesaid defendant property which constitutes or is derived from proceeds traceable to an offense constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense, including, but not limited to, the exchange of a controlled substance in violation of state and federal law.

3.     This action is also brought to enforce the provisions of 18 U.S.C. § 1955(d) for the forfeiture of the aforesaid defendant property which constitutes property used in violation of the provisions of Chapter 95 of the United States Code.

4.     The defendant property is $41,538.00 in U.S. Currency, which was seized on February 10, 2020, from Khaleel Ajigola OYENEYIN, in Greensboro, North Carolina, and is currently in the custody of the United States Marshals Service.

5.     Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant property.    This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

6.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1) and 1395, because the defendant property was seized while located in the jurisdiction of this Court, or one or more of the acts giving rise to forfeiture occurred in this district.

7.     Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

8.     The facts and circumstances supporting the seizure and forfeiture of the defendant property are contained in Exhibit A, attached hereto and wholly incorporated herein by reference.

- 2 -

WHEREFORE, the United States of America prays that process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

This the 10th day of August, 2020.

Respectfully submitted,

MATTHEW G.T. MARTIN
United States Attorney


/s/ Lynne P. Klauer
Lynne P. Klauer
Assistant United States Attorney
NCSB #13815
101 S. Edgeworth Street, 4th Floor
Greensboro, NC 27401
Phone: (336) 333-5351
Email: lynne.klauer@usdoj.gov

- 3 -

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws

of the United States of America, that the contents of the foregoing Complaint are

true and correct to the best of my knowledge, information and belief.

Kevin Cornell
Task Force Officer
Drug Enforcement Administration

# DECLARATION

I, Kevin Cornell, Task Force Officer with the Drug Enforcement Administration (DEA), Greensboro, North Carolina, hereby state, pursuant to 28 U.S.C. § 1746, under penalty and pursuant to the laws of the United States, that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a federal law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Title 21, United States Code.

2. I have been a Task Force Officer with DEA since May 2005, and am currently assigned to the Greensboro Resident Office. I have been a sworn Deputy Sheriff with the Guilford County Sheriff's Office (GCSO) since July 1998. I have been a Detective with the Special Operations Division - Vice/Narcotics Unit (Vice Unit) since April 2004, and in May 2012 was promoted to the rank of Detective Sergeant supervising the Special Operations Division - Specialized Enforcement/Criminal Interdiction Unit.

3. This declaration is submitted in support of a Verified Complaint of Forfeiture for $41,538 in U.S. currency seized on February 10, 2020.

4. As set forth herein, there is probable cause to believe that the $41,538 in U.S. currency is subject to seizure and forfeiture pursuant to Title 18, United States Code, Section 981, and Title 21, United States Code, Section 881.



GOVERNMENT
EXHIBIT
A
_____

5.      On February 10, 2020, at approximately 12:10pm, I conducted a traffic stop of a 2012 Honda Odyssey minivan, bearing NC registration plate TBS9400 on I85N at the Mt Hope Church Rd Exit for a violation of NC Motor Vehicle Law. Upon approach, I encountered the driver and sole occupant identified as Khaleel Ajigola OYENEYIN (a/k/a Khaleel Ajigola OYENYIN) who was also the registered owner of the vehicle.  Also, upon initial approach, I momentarily detected the faint odor cocaine emanating from the vehicle, but the odor was not sustained or detected further.

6.      During my brief conversation with OYENEYIN, I observed several indicators of criminality.  Upon returning to my patrol vehicle, I conducted a routine check via CJLEADS and found OYENEYIN was driving on a suspended license, had been convicted of a felony narcotics violation (offense date 2004), and had been charged with other narcotics, firearms, and violent crimes which had been dismissed or found not guilty.  At this point, I requested an assist unit via Communications and Detective T Gordy responded to the traffic stop location to assist.

7.      I re-approached OYENEYIN's vehicle, issued OYENEYIN a warning ticket and ultimately asked OYENEYIN for consent to search his vehicle. OYENEYIN consented saying "yeah, as long as I can watch y'all." I attempted to clarify several times with OYENEYIN regarding the scope of the search and OYENEYIN continued to provide ambiguous answers regarding allowing officers to search versus simply looking inside the vehicle.  During the discussion with OYENEYIN, he stated he had "a couple thousand bucks" in a bag.  OYENEYIN stated he had a vending business and this money was proceeds from that business.

8.      OYENEYIN was freely allowed to enter the rear side door of the vehicle and he retrieved a banded stack of money from the front pocket of a computer type attaché bag.  The currency was a large stack of money that appeared to be four (4) banded, one-inch stacks of $1.00

2

bills consistent with vending machine proceeds. OYENEYIN also voluntarily retrieved a folded stack of numerous $1.00 and $100.00 bills with an estimated total of $2000-$3000 from his pant pocket. I told OYENEYIN I was not interested in seizing the money he had shown officers since it was all one (1) dollar bills that appeared to be legitimate proceeds from vending machines. I asked OYENEYIN if he would allow officers to search the bag the money was retrieved from and OYENEYIN said he "would rather not, because you are gonna think there is drugs in there."

9.     I asked OYENEYIN where the vending machine money came from and OYENEYIN stated "Dirty South" which is a business location in Charlotte, NC. I asked OYENEYIN if he had any documentation for the money. OYENEYIN freely began searching around inside the vehicle in an obvious feigned attempt to try to locate documentation for the money. I observed OYENEYIN look in the front and back pockets of the computer type attaché bag and suggested to OYENEYIN, "maybe it is in the center there" at which point OYENEYIN unzipped the center section of the bag and I immediately observed a plastic bag containing a large amount of U.S. currency. Upon making this observation, I informed Detective Gordy of the observation and simultaneously told OYENEYIN, who was essentially sitting in the rear driver side seat to drop the drink he was holding. OYENEYIN then lunged toward the center of the van and was restrained and handcuffed by officers without incident.

10.     I conducted a searched of the computer type attaché bag and removed one plastic, money deposit bag containing two large banded bundles of U.S. currency with three banded stacks of currency with two envelopes denoting "Dirty South 2/10 Mon - Store End $20,769." The amount $41,538 was written on the outside of the bag in black pen. Additionally, several empty, unsealed plastic, money deposit bags identical to the plastic, money deposit bag the currency was contained in were found in one of the pockets of the computer type attaché bag.

3

11.     I asked where the money came from and OYENEYIN stated it came from "Dirty South Arcade" in Charlotte. OYENEYIN spoke in very vague terms when asked specific questions about the currency.  OYENEYIN's first statements made officers believe he was the owner of various vending machines with verbiage implying his business dealt with drinks and snacks vending.  When questioned further, OYENEYIN made his business sound like it was arcade-related implying it was machines at a legitimate video game arcade. OYENEYIN was also extremely hesitant or unwilling to provide the name of a specific person he received the money from and kept telling officers to "just call the business."  After several attempts, I learned from OYENEYIN the money was provided to him by "Jasmine" [later identified as Jasmine ACOSTA] an employee of Dirty South Arcade. When asked what name ACOSTA would know him by, OYENEYIN stated "Khaleel."

12.     I then conducted a telephone interview with Jasmine ACOSTA who advised she was a cashier at Dirty South Arcade.  I briefly explained the situation regarding the traffic stop and asked ACOSTA if she met Khaleel [OYENEYIN] at the business and ACOSTA stated several times, "she did not know anyone named Khaleel."  When asked if ACOSTA had given anyone any money this morning, ACOSTA then asked me to "hold on one second" and placed me on hold. During this hold, I asked OYENEYIN if the business would know him by any other name and he stated "JB."

13.     ACOSTA returned to the call after a one minute and fifteen second hold, and stated, "you must be referring to a vendor… I don't know his legal name… I know him as 'JB.'" ACOSTA further stated "JB" [OYENEYIN] picked up a deposit from the business earlier in the morning that was two deposits contained in two separate clear bags and the money was rubber banded. [OFFICERS NOTE: the U.S. currency found in OYENEYIN's vehicle was contained in

4

one plastic bag]. I asked ACOSTA if she knew the amount of the deposit and ACOSTA stated, "I know it was a large amount, let me see if I have a picture of the deposit." Ultimately, ACOSTA was able to provide the same dollar amount that was written on the bag. It appeared to me that during and after she placed our call on hold, ACOSTA was coached or getting information from a third party.

14.     When I questioned ACOSTA why she gave OYENEYIN the currency she stated, "he is taking it to deposit, it is not for him to have, he is going to deposit it." When asked where OYENEYIN was supposed to deposit the currency, ACOSTA stated, "it is outside of my knowledge of where it gets deposited" and further stated, "JB comes and collects money to deposit for us" and stated, she "was not involved in the deposit portion." ACOSTA made the analogy "it is like when a Brinks truck goes to McDonald's to pick up money," to which I stated the situation was nothing like a Brinks truck picking up money at McDonalds. [OFFICERS NOTE: If OYENEYIN is the owner or even a vendor of machines at Dirty South Arcade, any money provided to him would be considered profit(s) and there would be no reason for him to make a 'deposit' on behalf of Dirty South Arcade].

15.     I then began to ask ACOSTA specific questions regarding where the money came from and ACOSTA stated, the business is "like an arcade, like a game room" again implying it is a legitimate video game arcade. I asked specifically if the money came from Fish Tables and ACOSTA stated "yes." [OFFICERS NOTE: Fish Tables are commonly located in sweepstakes type businesses and in my experience, most all Fish Table type games are considered illegal gaming machines in North Carolina]. ACOSTA stated, all she knows is "he [OYENEYIN] collects money to deposit it, he comes and collects money, he is vendor per the owner." I asked ACOSTA if OYENEYIN had machines at the business and she responded, "per my knowledge,

he works for the vendor. I don't know anything outside of that." ACOSTA stated the questions I was asking could be better answered by the owner of Dirty South Arcade, named Hisham BEDWAN. I then attempted to obtain specific information related to ACOSTA and she began to question why that was necessary. I told ACOSTA we needed the information because she was involved, at which point ACOSTA became very defensive. ACOSTA provided her last name and when asked, she declined to provide her NC Driver's License number or date of birth and then stated, "the owner is calling me on the other line" and again placed me on hold.

16.     After a six-minute hold, ACOSTA returned to the line and stated she just spoke with the owner [BEDWAN] and asked me for my information so BEDWAN could call and speak with me. I again asked ACOSTA for her information. I even offered to read the NC Driver's License numbers of several subjects named Jasmine Acosta we had located in the NCDMV system so I could confirm who she was. ACOSTA then stated, "oh hell no, this is a scam" and hung up on me.

17.     I then attempted to call BEDWAN at the phone number ACOSTA had earlier provided and upon dialing the number, I got a recorded message indicating, "the mailbox was full" for that number.

18.     I then returned to OYENEYIN and asked him some clarifying questions. OYENEYIN confirmed ACOSTA gave the currency to him "in one bag" and further stated he counted and banded the currency with Jasmine [ACOSTA] and put the currency in the bag at the business earlier that morning. OYENEYIN specifically stated he was bringing the money to Lucky Duck Entertainment in Henderson, NC and said he "is a vendor." When asked on numerous occasions who specifically OYENEYIN was bringing the money to, he would always say "the

6

business" or "Lucky Duck Entertainment" and never would provide the name of an actual person he deals with or owner of Lucky Duck Entertainment.

19.     As I was speaking with OYENEYIN, I received an incoming call from the number I recognized as the phone number provided for Dirty South Arcade.  I answered the phone and spoke with a subject identifying himself as Hisham BEDWAN.  BEDWAN stated he was the owner of Dirty South Arcade.  I asked BEDWAN how he knew OYENEYIN.  BEDWAN stated "he [OYENEYIN] works for a vending company… Lucky Duck I believe is the name of it."  I asked BEDWAN to clarify why he said, "he believed" the name of the business was Lucky Duck since he is the owner shouldn't he know who he is dealing with, and BEDWAN stated he didn't know the exact legal name or the corporate name of the business. BEDWAN stated, "they pick up the currency from us, they vend to us and they pick up their currency."  I asked why they don't deposit the money in a bank and write the vendor a check, which is standard business practice, and specifically asked why he dealt in bulk cash.  BEDWAN stated "they do that Sir, I don't know, that is the way they conduct their business, I can't answer that question."  I confronted BEDWAN and asked, "who are they" he was speaking about, since BEDWAN is the owner of the business. I wanted to specifically know why BEDWAN, as the owner conducted his business in this manner. BEDWAN stated "that is how they do business, sometimes they do cash, sometimes they do check depending on who it is and the company."

20.     I asked BEDWAN how many machines OYENEYIN had at the location and BEDWAN initially stated four (4) but later stated five (5).  BEDWAN was making it sound like his business had too many machines for him to know specifics although I know from my experience that sweepstakes locations generally only have a minimal number of machines, so it would be highly unlikely for a true business owner to not know exactly what and how many

7

machines were in inventory. I specifically asked how many "fish table" machines the business had and BEDWAN stated, "there is nine (9) tables total." I asked BEDWAN if he took a percentage [of the profits], and BEDWAN stated, "I get a commission, I own the building" and then stated since these are private business matters, he would rather talk face to face. At this point, I made the determination BEDWAN was simply the owner of the building and not a true business owner and Dirty South Arcade was more of a front for illegal gambling and/or money laundering than a legitimate "amusement arcade" like all parties portray it as. I then asked BEDWAN if he had ACOSTA's date of birth and BEDWAN put me on hold. After a brief period of holding with BEDWAN, I discontinued the phone call with BEDWAN.

21.     I then returned to my patrol vehicle and retrieved my narcotics detection canine, Maggie to conduct a sniff of the plastic, money deposit bag containing the $41,538.00 in U.S. currency, which Det Gordy had moved to the front passenger side floorboard of the minivan at my direction. I deployed canine Maggie on the interior of the minivan and a positive alert to the odor of narcotics was observed on the plastic, money deposit bag containing the $41,538.00 in U.S. currency.

22.     In October of 2005, I was selected by the Guilford County Sheriff's Office to be the canine handler for Canine Cozmo and they were assigned to the GCSO Vice / Narcotics unit primarily conducting criminal interdiction with the Greensboro DEA Task Force. Canine Cozmo and I were a certified narcotics detection team through the North America Police Work Dog Association for approximately 8.5 years until Canine Cozmo was taken out of service in January of 2014 for health issues. Canine Cozmo and I were credited with locating over eight thousand (8,000) pounds of illegal narcotics and over $4,000,000 in bulk United States currency while

8

conducting criminal interdiction investigations and assisting in various local, state and federal narcotics investigations.

23.     In February of 2014, the Guilford County Sheriff's Office purchased Canine Maggie from Shallow Creek Kennels in Sharpsville, PA as a replacement for Canine Cozmo.  I was selected to be the handler. Canine Maggie is a female Belgium Malinois, a breed specifically selected for their keen senses and ability to be trained to detect the odor of controlled substances. Canine Maggie underwent a two-week initial training period at the Guilford County Sheriff's Office canine facility conducted by senior canine handlers Master Corporal E. Stanley and Corporal D. Thompson. We participated in a one-month training period under the indirect supervision of Master Corporal E. Stanley and Corporal D. Thompson.  During this training period, Canine Maggie proved that she could reliably use her olfactory senses to locate narcotic training aids of actual controlled substances which include Heroin, Cocaine (HCl and Base), Marijuana / Hashish, and Methamphetamines.  After successful completion of this training, Canine Maggie was entered into service with the Guilford County Sheriff's Office – Special Operations Division as a narcotics detection canine.

24.     Canine Maggie and I were originally certified as a Narcotics Detection Team by the North American Police Working Dog Association in the detection of Marijuana, Cocaine, Heroin, and Methamphetamines on March 28, 2014.  Canine Maggie and I certify annually as a Narcotics Detection Team with the North American Police Working Dog Association, the most recent certification being on September 17, 2019.  This certification is valid for one year from the date of issuance.

25.     Canine Maggie is trained to "Passively Alert" after detecting the odor of narcotics for which she has been trained.  This "Passive Alert" consists of a physical reaction which

ultimately ends in her coming to a sitting and/or laying position when the odor of narcotics for which she is trained is detected. Canine Maggie also exhibits various mental and physical reactions which I am familiar with as noticeable changes in her behavior such as becoming possessive of the area, a refusal to leave an area where the odor of narcotics is detected and changes in her breathing rate and sniffing patterns.

26. Canine Maggie undergoes frequent training for the detection of concealed controlled substances, which is on-going in order to ensure her proficiency. I have attended numerous seminars / training sessions sponsored by various professional organizations such as; the North American Police Working Dog Association (NAPWA), National Criminal Enforcement Association (NCEA), United States Police Canine Association (USPCA) and others, which have exposed him to basic and advanced narcotic concealment methods, narcotics detection issues, training and animal behavior. I also frequently consults various periodicals to stay informed about current trends utilized by narcotics traffickers to include advanced narcotic concealment methods.

27. I have successfully demonstrated the ability to properly deploy and maintain a police narcotics canine and effectively locate controlled substances with the assistance of Canine Maggie that have been concealed in a variety of locations since being placed into service. Canine Maggie and I have assisted various local, state and federal law enforcement officers in numerous narcotics investigations.

28. I then took the banded stack of $1.00's OYENEYIN initially showed officers and the stack of $1.00's and $100.00's and physically handed both amounts of money to OYENEYIN as witnessed by Det Clapp. I explained I was seizing the bag of money since a narcotics detector canine alerted on the bag. [OFFICERS NOTE: OYENEYIN did not make any statement or have any reaction to the fact a narcotics detector canine alerted to the odor of narcotics on the money

10

bag. When later confronted why he had no reaction, OYENEYIN stated, "all money has drugs on it."

29.     I seized the currency and placed it in a self-sealing evidence bag and provided OYENEYIN a receipt for a bag containing an undetermined amount of USC.   OYENEYIN and his vehicle were released from the scene, thereby ending the traffic stop.

30.     Post seizure investigation related to the information provided by OYENEYIN regarding Dirty South Arcade in Charlotte, NC found that the address and phone number are both attributed to another business called Dirty South Customs & Motoring, a business dealing with automotive parts, accessories and vehicle customization.  Intra-agency research indicates both the address and phone number of this location are known to be associated and/or in contact with known narcotics traffickers.

31.     Additionally, post seizure investigation related to the information provided by OYENEYIN regarding Lucky Duck Entertainment in Henderson, NC found that the address and phone number are both attributed to another business called House of Toyz (*sic*), a business dealing with automotive parts, accessories and vehicle customization.  Intra-agency research indicates both the address and phone number of this location are known to be associated and/or in contact with known narcotics traffickers.

32.     Intra-agency research indicates OYENEYIN has known involvements in narcotics trafficking and money laundering and his phone number is in contact with known narcotics traffickers.

33.     On February 12, 2020, the U.S. currency was transported to Loomis Fargo located at 114 Roche Drive, Durham, North Carolina, and was confirmed to be $41,538.00. The U.S. currency, consisting almost entirely of $20.00, $50.00 and $100.00 bills, was

Case 1:20-cv-00722   Document 1-1   Filed 08/10/20   Page 11 of 13

deposited electronically via Loomis to the U.S. Marshal Service Seized Assets Deposit Fund.

34.     DEA began administrative forfeiture proceedings.  Notice of the forfeiture proceeding was published on an official government internet site (www.forfeiture.gov) from April 13, 2020, to May 12, 2020.  On May 5, 2020, DEA received a claim to the defendant currency from Albert Siplen, who alleged the cash "was proceeds of a legal gaming operation in Charlotte, NC operating under the name of Dirty South. Claimant had an interest in the proceeds of this operation at the time of the seizure."  Upon receipt of this claim, the administrative forfeiture process was terminated and the seizure was referred to the United States Attorney's Office for judicial forfeiture.

35.     I have not conducted an independent investigation into gambling operations at Dirty South or Lucky Duck, but based on my training and experience I know that "fish table" games and other video gambling devices are illegal under N.C. Gen. Stat. §§  14-301 - 306.1A.

## CONCLUSION

36.     Based on the foregoing, I maintain there is probable cause to believe that the $41,538.00 in U.S. currency, was furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act, 21 U.S.C. §§ 801 et seq., or represents proceeds traceable to such an exchange, and is therefore subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 21 U.S.C. § 881(a)(6).

12

This the 8 day of August, 2020.

Kevin Cornell
Task Force Officer
Drug Enforcement Administration

13